IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| HOOTERS OF AMERICA, LLC, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION FILE |
| LA CIMA RESTAURANTS, LLC, | ) | |
| | ) | NO. _____ |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

Plaintiff Hooters of America, LLC ("HOA" or the "Company") brings this action for legal damages and equitable relief against Defendant La Cima Restaurants, LLC ("La Cima"). As set forth in the factual recitation below, La Cima, a direct competitor of HOA, has violated myriad federal and state laws by misappropriating sensitive trade secrets and other confidential and proprietary information of the Company, and putting such wrongfully acquired information to improper competitive use. Joseph W. Hummel ("Hummel"), a former executive of HOA and now a Partner and Chief Operating Officer of La Cima, gained unauthorized access to HOA's computer systems, misappropriated HOA's trade

secrets and confidential business information, and shared such information with La Cima.  Because HOA has been and will continue to be severely, immediately, and irreparably harmed by La Cima's use of its most sensitive business information, HOA respectfully requests that this Court grant the relief it now seeks.

## PARTIES

1.     HOA, the corporate successor to Hooters of America, Inc., is a Georgia Limited Liability Company, with its headquarters and principal place of business at 1815 The Exchange, Atlanta, Georgia.

2.     La Cima is a Georgia Limited Liability Company, with its principal place of business at 2060 Mount Paran Road NW, Suite 106, Atlanta, Georgia.

## JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over HOA because the Company's principal place of business is located within the State of Georgia.

4.     This Court has personal jurisdiction over La Cima because La Cima has its principal place of business in the State of Georgia.

5.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331, because the Complaint asserts claims arising under the federal Computer Fraud and Abuse Act (18 U.S.C. § 1030) and the federal Electronic Communications Privacy Act (18 U.S.C. § 2701).  This Court has

supplemental jurisdiction over the pendent state law claims asserted herein pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1), because La Cima has its principal place of business in the Atlanta Division of the Northern District of Georgia.

## FACTUAL BACKGROUND

7.      HOA operates or franchises over 400 casual dining restaurants located in 44 states and abroad.  HOA's restaurants are beach-themed establishments that feature jukebox music, sports on television, and a menu that includes seafood, sandwiches, salads and spicy chicken wings.  Each restaurant is staffed by the iconic "Hooters Girls," women portraying an all-American cheerleader image, and they represent the cornerstone of HOA's concept.  HOA has a particularly strong presence in the southeastern United States, the region where it was founded, with a combined 67 Company-owned restaurant locations in Florida, North Carolina, Georgia, Alabama, South Carolina, and Mississippi.

8.      La Cima is a direct competitor of HOA, having entered into a series of franchise development agreements with Twin Peaks Restaurants ("Twin Peaks").  Like HOA, Twin Peaks operates and franchises restaurants, currently staffing 15 locations in Texas, New Mexico, Oklahoma, Louisiana, Kansas, and Nebraska.

Although the Twin Peaks décor is mountain lodge-inspired (rather than beach-themed), Twin Peaks directly competes with HOA in the market of casual dining restaurants featuring an all female waitstaff.  On its website, Twin Peaks describes its focus as male-oriented, exhibiting sporting events on in-store televisions and "the friendly, attentive, and beautiful Twin Peaks Girls."

9.     La Cima was formed as a Limited Liability Company in Georgia on June 22, 2011.

10.     In August, 2011, La Cima and Twin Peaks announced that La Cima had entered into a series of development agreements to open 35 Twin Peaks restaurant franchises over the next decade.  These 35 restaurants will be located in the southeast—specifically, Florida, North Carolina, Georgia, Alabama, South Carolina, and Tennessee.  As such, they are expected to compete directly against HOA's restaurants within the same geographic regions.

11.     Hummel was employed by HOA from December, 2003 until his voluntary resignation on July 22, 2011.  At the time of his resignation, Hummel was the Company's Executive Vice President of Operations and Purchasing.

12.     On July 11, 2011, Hummel tendered his resignation to HOA, which resignation HOA subsequently accepted.  Hummel's employment with the

Company officially terminated on July 22, 2011, exactly one month after La Cima's legal formation.

13.     Shortly following his resignation from HOA, Hummel officially joined La Cima as a Partner and its Chief Operating Officer.

14.     Several other former HOA executives resigned from the Company in close temporal proximity to Hummel's separation, and have joined Hummel at La Cima.  These executives include former Chief Executive Officer Coby Brooks, former Vice President and General Counsel Clay Mingus, former Vice President of Company Store Operations Roger Gondek, and former Vice President and Controller James Tessmer.  Each of these executives resigned from his employment at HOA near in time to the formation of La Cima, ranging from two days prior to La Cima's formation to five weeks post-formation.

15.     Hummel and his former executive colleagues coordinated the timing of their departures from HOA, and have formed La Cima to exploit their knowledge of HOA's trade secrets and confidential business information and thereby compete unfairly against HOA.

16.     La Cima intends to quickly develop Twin Peaks franchises that are directly competitive with some of HOA's most profitable restaurant locations. Hummel has thus publicly stated that La Cima is "pursuing the metro Atlanta

market," with plans to open five to seven Twin Peaks restaurants in this region within the next five to seven years.  A true and correct copy of a September 9, 2011 newspaper article in the *Atlanta Business Chronicle* is attached as <u>Exhibit A</u>. The metro Atlanta market is an HOA stronghold, featuring a number of the Company's most successfully performing restaurants.

17.    Hummel has acknowledged that La Cima, under the leadership of former executives of HOA like himself, will pursue this market because, "[w]e know the Atlanta market pretty well since we've been here awhile."  (<u>Exhibit A</u>.) Much of Hummel's "knowledge" about the Atlanta market consists of protected confidential information acquired during and by dint of Hummel's fiduciary relationship with HOA.

18.    Motivated by a desire to benefit his new business venture at La Cima, Hummel has misappropriated a great volume of confidential and proprietary business information belonging to HOA.

19.    Hummel was uniquely well-positioned to misappropriate such valuable and sensitive information from HOA.  During his tenure with HOA, Hummel served as a senior member of the Company's management, rising to the level of Executive Vice President and earning in excess of $300,000 in compensation during his last full year of employment.  At the time his employment

terminated, Hummel supervised seven direct reports and scores of indirect reports spanning several Company departments, including Purchasing, Distribution, Training, Research and Development, and Operations.

20.     As an Executive Vice President, Hummel was a trusted member of HOA's senior leadership team.  Reflecting that trust, Hummel was involved in the Company's most important decisions and privy to the most highly classified Company information.  For example, Hummel participated in joint monthly meetings of HOA's executive management team and members of the board of directors, at which meetings detailed discussions of sensitive and highly confidential Company information and plans took place.  At these meetings, each Company department would present a comprehensive update of all ongoing projects, future initiatives, and goals.  This included such privileged matters as HOA's real estate development plans, menu innovations, product research and development, pricing, forward-looking marketing strategies, and franchise development.     In short, Hummel was and remains possessed of tremendous amounts of the Company's most confidential business information and trade secrets.

21.     Throughout his career at HOA, Hummel enjoyed unequaled access to the Company's most sensitive business information, data and documents.  Such

proprietary information included the identities of and arrangements with Company

vendors and suppliers, short and long-term marketing plans, recruiting and

employee development programs, pricing information, franchise and store

performance data, and other forms of internally developed business intelligence.

Such non-public information would be of extraordinary value to competing

concerns, and HOA thus takes pains to ensure and safeguard its secrecy.

22.     Subsequent to Hummel's resignation, HOA discovered that, in the

weeks leading up to such resignation and on several occasions thereafter, Hummel

downloaded and transmitted to his private e-mail account – without Company

authorization – a substantial volume of HOA documents and emails from

colleagues containing sensitive and highly confidential business information.

Included among the data Hummel misappropriated were a proprietary management

development blueprint used to recruit and retain employees, descriptions of the

Company's unique distribution infrastructures, compilations of sales figures

reflecting the comparative strength of various HOA stores, specific plans to

capitalize on internal market forecasts, a step-by-step checklist for integrating new

vendors, analyses of historical and prospective marketing efforts, detailed

information about private contractual arrangements negotiated with vendors,

miscellaneous inventory and ordering information, and specific restaurant franchise performance data.

23.     The first of Hummel's electronic misappropriations to his private email account (of which the Company is aware) occurred on July 2, 2011, a mere 10 days after the formation of La Cima and just 9 days before Hummel informed HOA of his intention to resign his employment.

24.     Hummel accessed and took many HOA documents from the Company's computer servers even after July 22, 2011, his last day as an employee of HOA.  After that date, Hummel was no longer authorized to access any HOA computer systems.  Due to confusion caused by the abrupt departure of Hummel and several other senior executive employees, however, Hummel's computer access was not disabled coincident with his final date of employment, as is the Company's customary practice.  Hummel exploited this oversight by deploying the credentials entrusted to him for use during his employment to access and misappropriate valuable, confidential and proprietary Company documents. Hummel did so on at least five separate occasions _after_ his employment terminated, transmitting the stolen information to his personal email account for use in his competitive venture at La Cima.

25.     The documents electronically diverted by Hummel comprise well over 500 pages of highly sensitive business information and trade secrets belonging to HOA.

26.     Upon information and belief, Hummel has also misappropriated confidential and proprietary data and trade secrets embodied in physical files of HOA, including but not limited to documents containing highly sensitive information from the joint monthly meetings of the Company's board of directors and senior management team.  Hummel failed to return these materials to HOA when he resigned, in violation of Company policy.

27.     Hummel engaged in these misappropriations at the direction of, on behalf of, and/or for the benefit of La Cima.  On information and belief, Hummel has already transmitted the misappropriated information to or otherwise shared it with La Cima, with the intention that La Cima make improper competitive use of such information to HOA's detriment.

28.     Upon information and belief, Hummel and La Cima have used and continue to use the confidential and proprietary business information and documents misappropriated from HOA.  With La Cima's first restaurant opening less than a year away, the confidential information and trade secrets

misappropriated by Hummel and La Cima are already being put to improper use to develop directly competitive franchises in the metro Atlanta area.

29. The casual dining industry operates on extremely thin profit margins. As a result, every operational advantage, such as HOA's economically efficient supply chain, is a jealously guarded business secret. The broad universe of information misappropriated by Hummel and now in La Cima's possession includes operational data and strategic planning materials that would enable a competitor to replicate HOA's successful operation without any of the substantial investment of time and resources required to develop such successful business models. In sum, Hummel took and La Cima now possesses a wide variety of trade secrets and other confidential and proprietary business information belonging to HOA– information that will endow a competitor like La Cima with significant competitive advantages relative to the Company.

30. HOA is keenly aware of the critical importance of protecting the confidentiality of its trade secrets and other proprietary business information. As a result, the majority of HOA's trade secret information and data are stored on the Company's secure network servers. HOA expends significant resources to maintain the security of this data and the integrity of the information technology servers on which it is stored. As a Payment Card Industry Level 1 company, HOA

takes the security of its business information seriously and maintains up-to-date

firmware and firewalls.  Every HOA employee must enter a unique user name and

password to log on to the network before using any Company computer.  These

passwords are subject to minimum complexity requirements, and they must be

changed no less frequently than every 90 days.  Other information technology

protocols maintained by HOA include selectively limiting which employees may

access certain documents.  Access to electronic user directories is thus controlled

on both an individual and a departmental basis.  For example, Employee A cannot

access data in Employee B's user directory without requesting and being granted

access by the Information Technology Department.  Similarly, Human Resources

personnel cannot access information in the Accounting Department directory

without requesting and being granted authorization for such access.  The process of

seeking access to electronically stored documents involves submission of a request

form with an authorized signature, which is then reviewed by the Information

Technology Department.  In this manner, HOA rigorously controls access to its

most sensitive documents.

    31.    Another means by which HOA protects its trade secrets and

confidential and proprietary business information is to enter into legally-binding

confidentiality agreements with its employees.  Thus, at the outset of his

employment with HOA, Hummel signed the "Hooters of America, Inc.'s Confidential Information Agreement" (the "Agreement").  A true and correct copy of the Agreement is attached hereto as <u>Exhibit B</u>.  When he signed this Agreement, Hummel agreed to certain restrictions on his conduct both during and after his employment at the Company.  Section 2 of the Agreement thus provides in pertinent part as follows:

> (a) Employee agrees to act as a trustee of the information described in . . . this Agreement which is not generally known to the public.

> (b) Employee further represents to HOA that, as an inducement to HOA to employ or continue to employ Employee, Employee will hold such information in trust and confidence for the use and benefit solely of HOA.

> (c) During Employee's employment by HOA, and for a period of two (2) years thereafter, Employee agrees that, without prior written permission from HOA's General Counsel, Employee shall not publish, communicate, divulge or otherwise disclose such information to any person, firm, company, corporation, association, partnership or other entity for any reason or purpose whatsoever. . . .

(<u>Exhibit B</u>, § 2.)

32.    In signing the Agreement, Hummel further agreed to safeguard and return to HOA all proprietary information and personal property of the Company promptly following the termination of his employment.  Section 3 of the Agreement thus provides in pertinent part:

> (a) Within two (2) business days of the Employee's separation
> from HOA's employment, Employee agrees to return to HOA
> all documents relating to Employee's employment . . . including
> but not limited to originals and all copies of the originals, whether
> altered . . . or otherwise.

(Exhibit B, § 3.)

33.   The obligations contained in the Agreement were expressly intended by the parties to "survive the separation of Employee from employment by HOA, regardless of the reason for this separation."  (Exhibit B, § 8(c).)

34.   HOA also maintains strict policies to protect its confidential and proprietary information.  Governing policies are contained in the Company's Corporate/Management Employee Handbook (the "Handbook"), which handbook is distributed to all employees shortly after their hire.  The Company specifically reviews the provisions of the Handbook, including those related to confidentiality and data security, with all new employees during their post-hire orientation process.

35.   Among HOA's policies is a policy entitled "Confidential Nature of Work," which references and reiterates the obligations set forth in the Agreement and provides in pertinent part as follows:

> [I]t is each Employee's responsibility to preserve all privileges
> and legal rights HOA has in information HOA maintains, and to
> protect HOA from disclosure of confidential information and

trade secrets, both during and after your tenure with HOA. Accordingly, you must hold such information in trust and confidence for the use and benefit solely of Hooters of America, and not publish, communicate, divulge or otherwise disclose such information to any person, firm, company, corporation, association, partnership or other entity for any reason or purpose whatsoever.

A true and correct copy of the pertinent, confidentiality-related portions of the

Handbook (pp. 9–10) is attached as <u>Exhibit C</u>.

36.    HOA likewise maintains a Company "E-Mail Policy," which provides

in relevant part that "Employees may not create or use a password, access a file, or

retrieve any stored communication without authorization."  (<u>Exhibit C</u>, at p. 51.)

37.    HOA additionally maintains a policy entitled "Employer Information

and Property," which provides in pertinent part as follows:

The protection of Hooters business information, property and all other Company assets [is] vital to the interests and success of Hooters.  No Hooters related information or property, including without limitation, documents, files, records, computer files, equipment, office supplies or similar materials (except in the ordinary course of performing duties on behalf of Hooters) may, therefore, be removed from the Company premises.  In addition, when an employee leaves Hooters, the employee must return to the Company all Hooters related information and property that the employee has in his/her possession, including without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, thumb drive or similar storage device, supplies, and equipment or office supplies.

(<u>Exhibit C</u>, at p. 53.)

38.     HOA expends extraordinary effort and substantial economic resources to safeguard the secrecy of its business information and the integrity of the information technology systems on which such information is stored.

39.     Due to his many years of experience in operations, Hummel knew before he took the business information belonging to HOA that he did that it would be of enormous competitive value to other restaurants or restaurant developers seeking to serve the same clientele as HOA.

40.     La Cima has chosen to develop its new business aggressively in the Atlanta metropolitan region in order to capitalize on the trade secrets and confidential and proprietary business information it has misappropriated from HOA.  Indeed, La Cima has announced plans to open its first Twin Peaks franchise in Atlanta "during the first half of 2012."  (Exhibit A.)  Since it takes months and sometimes years to develop and open a new restaurant franchise, La Cima is working quickly to exploit HOA's trade secrets and confidential business information before such information becomes outdated and less competitively useful.

41.     In his executive role with La Cima, it is inevitable that Hummel will be called upon and have occasion to use or disclose confidential and proprietary business information of HOA in his knowledge or possession as he seeks to

position his new employer's restaurants against HOA's in an extremely competitive marketplace.

42.     The actions of Hummel and La Cima threaten HOA with serious competitive harm.

## COUNT I
## (VIOLATION OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT – UNAUTHORIZEED ACCESS TO A PROTECTED COMPUTER)

43.     HOA repeats and incorporates by reference the allegations contained in paragraphs 1 though 42 of this Complaint as if set forth fully at length herein.

44.     HOA's servers are protected computers that are used in or affect interstate commerce.

45.     By logging into HOA's secure servers after his employment with the Company had terminated, Hummel violated federal law by intentionally accessing a protected computer without authorization and obtaining information therefrom on no fewer than five separate occasions.

46.     La Cima is vicariously liable for Hummel's violations because Hummel was acting at the direction of, on behalf of, and/or for the benefit of La Cima.

47.     By virtue of this unauthorized access and misappropriation, La Cima has caused HOA to suffer economic losses aggregating far in excess of $5,000 in value, including but not limited to costs associated with responding to the offense.

48.     HOA is entitled to compensatory damages for the economic losses directly and proximately caused by La Cima's violations of 28 U.S.C. § 1030.

## COUNT II
## (VIOLATION OF THE FEDERAL ELECTRONIC COMMUNICATIONS PRIVACY ACT -- STORED ELECTRONIC COMMUNICATIONS)

49.     HOA repeats and incorporates by reference the allegations contained in paragraphs 1 though 48 of this Complaint as if set forth fully at length herein.

50.     By logging into HOA's secure servers after his employment with the Company had terminated and downloading emails and attachments created by employees of HOA, Hummel violated federal law by intentionally accessing and obtaining communications stored on a facility through which an electronic communication service is provided.

51.     Hummel accessed and obtained such stored electronic communications without HOA's knowledge, authorization, or consent on no fewer than five separate occasions.

52.     La Cima is vicariously liable for Hummel's violations because Hummel was acting at the direction of, on behalf of, and/or for the benefit of La Cima.

53.     By accessing and obtaining such stored communications of the Company and its employees, La Cima has caused HOA to suffer economic losses.

54.     HOA is entitled to monetary damages as compensation for the economic harms directly and proximately caused by La Cima's violations of 18 U.S.C. § 2701.

55.     Because La Cima accessed these stored communications willfully and intentionally, HOA is additionally entitled to punitive damages and reasonable attorney's fees.

## COUNT III
## (VIOLATION OF GEORGIA COMPUTER SYSTEMS PROTECTION ACT – COMPUTER THEFT)

56.     HOA repeats and incorporates by reference the allegations contained in paragraphs 1 though 55 of this Complaint as if set forth fully at length herein.

57.     When Hummel accessed HOA computers and servers following the termination of his employment, he did so without authorization.

58.     Hummel gained such post-employment access to HOA's computers and servers with knowledge that he was not authorized to do so and with the intent of misappropriating property belonging to HOA.

59.     Hummel's acts of computer theft violated Georgia law.

60.     La Cima is vicariously liable for Hummel's violations because Hummel was acting at the direction of, on behalf of, and/or for the benefit of La Cima.

61.     La Cima's computer theft has caused economic harm to HOA, including but not limited to the costs associated with responding to the offense and monetary damages caused by its competitive use of the information taken.

62.     HOA is entitled to monetary damages as compensation for the economic harms directly and proximately caused by La Cima's violations of O.C.G.A. § 16-9-93(a).

## COUNT IV
### (MISAPPROPRIATION OF TRADE SECRETS)

63.     HOA repeats and incorporates by reference the allegations contained in paragraphs 1 through 62 of this Complaint as if set forth fully at length herein.

64.     Both prior to and following the termination of his employment with HOA, Hummel intentionally took confidential and proprietary information that belongs to HOA.

65.     This information is economically valuable to HOA, and derives such value from not being generally known to the public or to Company competitors.

66.     The information taken is, in fact, not generally known to the public or to the Company's competitors and is not readily ascertainable by any proper means.

67.     HOA has used and continues to use adequate and appropriate security measures to protect and maintain the secrecy of its commercially valuable, confidential information.

68.     Hummel took the foregoing actions at the direction of, on behalf of, and/or for the benefit of La Cima, as its Chief Operating Officer.

69.     The confidential and proprietary information misappropriated by La Cima constitute trade secrets as defined in O.C.G.A. § 10-1-760 *et seq.*

70.     La Cima acquired these trade secrets by improper means, which include theft, misrepresentation, breach of contract, and violation of the fiduciary duty of loyalty once owed to HOA by Hummel.

71.     The downloading and retention of HOA's confidential and proprietary business information constitutes misappropriation of the Company's trade secrets, in violation of the Georgia Trade Secrets Act of 1990 (O.C.G.A. § 10-1-760 *et seq.*).

72.     As a direct and proximate result of such misappropriation, HOA has suffered economic harm.

73.     As evidenced by, *inter alia*, Hummel's intentional computer penetration after his employment at HOA had terminated, the misappropriation of the Company's trade secrets was willful and malicious.

74.     HOA is entitled to monetary damages as compensation for the economic harms directly and proximately caused by La Cima's violations of the Georgia Trade Secrets Act of 1990.

75.     Based on the willful and malicious nature of the violations, HOA is entitled to exemplary damages and its reasonable attorney's fees.

## <u>COUNT V</u><br><u>(CONVERSION)</u>

76.     HOA repeats and incorporates by reference the allegations contained in paragraphs 1 through 75 of this Complaint as if set forth fully at length herein.

77.     Both prior and subsequent to the termination of his employment with HOA, Hummel knowingly and willfully misappropriated valuable, confidential business information and documents belonging to HOA, and did so by removing such material from Company computers and diverting the same to the possession of La Cima.

78.     Hummel failed to return property of HOA to the Company upon the termination of his employment.  This failure thereupon resulted in La Cima's possession and misuse of such property.

79.     By these actions, La Cima has directly and proximately caused economic harm to HOA.

80.     La Cima is liable to HOA in monetary damages for tortious conversion.

## COUNT VI
## (TORTIOUS INTERFERENCE WITH CONTRACT)

81.     HOA repeats and incorporates by reference the allegations contained in paragraphs 1 through 80 of this Complaint as if set forth fully at length herein.

82.     The Agreement (Exhibit B) is a valid and enforceable contract between HOA and Hummel.

83.     Upon information and belief, La Cima solicited Hummel to join it as a partner and executive officer prior to Hummel's resignation from HOA.

84.     Upon information and belief, La Cima induced Hummel to misappropriate trade secrets and confidential business information of HOA, in order that La Cima could make competitive use of them.

85.     La Cima had actual knowledge of Hummel's contractual duties of confidentiality to HOA.

86.     La Cima has interfered with HOA's contractual relationship with Hummel purposefully, and with the intent to harm HOA, by inducing Hummel to violate his contractual duties of confidentiality and to use the Company's confidential and proprietary business information to its competitive detriment.

87.     As a direct and proximate result of La Cima's tortious interference with HOA's contractual relationship with Hummel, the Company has suffered and will continue to suffer substantial economic harm.

88.     HOA is entitled to compensatory damages for La Cima's tortious interference with contract.

WHEREFORE, HOA respectfully requests that this Court:

(a)     Enter judgment in favor of HOA against La Cima;

24

(b)     Award HOA compensatory damages in an amount to be determined at

trial;

(c)     Award HOA exemplary or punitive damages in an amount to be

determined at trial;

(d)     Enjoin La Cima from continuing to employ Hummel in order to

prevent both continued exploitation of the trade secrets he

misappropriated and the inevitable use and disclosure of the

confidential and proprietary business information of HOA he

possesses;

(e)     Enjoin La Cima from the continued retention and use of HOA's

confidential and proprietary business information;

(f)     Order a forensic examination of La Cima's computer drives and

storage devices in order to ensure their full compliance with remedies

(d) and (e) hereinabove; and

(g)     Award HOA its reasonable attorney's fees and such other and further

relief as the Court deems just and fair.

## JURY DEMAND

HOA hereby demands a trial by jury on all claims so triable.

Respectfully submitted,

Hooters of America, LLC

By its attorneys,

/s/  Valerie S. Sanders
John H. Fleming (263250)
Valerie Strong Sanders (625819)
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, NE
Atlanta, GA 30309-3996
404.853.8000 (ph)
404.853.8806 (fax)
john.fleming@sutherland.com
valerie.sanders@sutherland.com

Robert B. Gordon (*pro hac vice* pending)
Jillian M. Harrison (*pro hac vice* pending)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
617.951.7000 (ph)
617.951.7050 (fax)
robert.gordon@ropesgray.com
jillian.harrison@ropesgray.com

Counsel for Plaintiff

Dated:  September 28, 2011